Okay, Mr. McCown. Good morning, judges. May it please the court, counsel, I along with Jennifer Judge at the counsel table represent Appellant Amarillo Heart Group. This is an appeal from an adverse jury verdict and a denial for a motion for judgment as a matter of law on a retaliation case tried to a jury in Amarillo, Texas, of race 3 issues for consideration. The first one deals with the objectionable reasonable belief standard required to be proving a retaliation case. We do not dispute that she had a subjective belief, but we do dispute that there's evidence to support the jury verdict to the contrary on the objective reasonable belief to establish the protected activity. Since the What about the fact that, I mean, literally the day after she has this meeting where they talk about this, quote, all black people look alike, close quote, comment, she's fired. I mean, we talk about temporal proximity and it's usually weeks and this and that. I mean, here it's like the next day they turn around and fire her right after she complains. I mean, that's pretty good evidence. It's not maybe by itself enough, but, man, that's getting you almost across the line. I don't believe that it was You're about to hit the plane of the goal or whatever, you know? I don't believe it was exactly the next Well, it was February 9th I thought that she had the meeting. They set up a meeting. They had a meeting. Okay. Soya asked Scott to join him in the examination room on February 9th. They have this discussion about the, quote, all black people, close quote, comment, and then the very next day on February 10th, Soya testified he made the decision to terminate. And like in a lot of employment decisions, there were two things proceeding at the same time. One was this was the first complaint that Dr. Soya received. There were other issues that she testified about, but she never complained about them. As a matter of fact, I think she said she just walked away from them. So we still have to look at the is this actually protected activity, this complaint, but at the same time, Dr. Soya, who was the decision maker in hiring her and making her a permanent employee and also the one that decided to terminate her, was dealing with her conduct as an employee that he felt was very dangerous and not beneficial for Amarillo Heart Group and its patients because this is a critical care heart thing. But isn't that what the jury does sort through that? He says it was because she was writing on the blackboard too much, and she says it was because she complained about this guy who was making these racist comments. I mean, isn't that what juries resolve every day? If we were saying that that was the issue that we have on appeal, but we're not. We're saying that there is not the objective, reasonable belief, there hasn't been established that. In other words, that is that protected activity must exist before she's protected. It doesn't matter what she says or how she says it. Okay, so she's complaining about somebody making racist comments to you is not protective activity. That's what you're wanting us to rule. It may not be. Okay. So tell me the limiting standard that you want us to apply here. And that's why the issue is framed as narrow as it is. If you look at Beyer v. Dallas Morning News, which was decided in 2000, there were four complaints there about disparate treatment. The individual, Mr. Beyers, was fired by the Dallas Morning News. And even though this was a summary judgment case, the issue of whether there was objectively reasonable belief was decided by the district court and upheld by the Fifth Circuit that this was not going to be actionable. There's also, there's been some unpublished opinions since that time. One of the most notable ones is Compass Group in 2011. And that's found, it is in Westlaw, and it's found in 426 Fed Appendix 2. I mean, aren't you essentially arguing if you can't make the claim for the underlying discrimination, you can't recover on retaliation? And isn't that contrary to the whole idea? That like you make a claim that she lost on, I don't know, summary judgment 1286, whatever, on the actual discrimination. Because those comments, however distasteful and wrong, were not enough. But to me, that would mean that all retaliation cases require as a predicate that you succeed on discrimination. That's not the law. So, I'm not. No, I agree that's not the law. Okay. So, you're. The district court refused to charge the jury on the race game. Right. And so, but that does not defeat the retaliation claim. Not in and of itself, but it certainly is instructive as to what the district court thought the evidence was as to race discrimination. Well, if we're going to talk about the district court thought, she ruled against you, Judge Patterson. She did. She's a very experienced district judge, and I think she ruled against you on this exact point. So, I guess discerning her mind doesn't probably help you. Well, the point is that she never ever discussed what we think is the law on the Dallas Morning News. And if I can refer to a case that is a hostile work environment case that was decided on the block, this is EEOC versus Bow Brothers Construction, which was participated in by a number of the members of this panel, and some are on the dissent, some are in the majority. But I think it's instructive because if you think about this one comment, all black men look alike, made by a coworker, and what he testified to was jest, which was immediately to Ms. Scott, and Dr. Sawyer followed up on it, and she said that everything's okay. So we have that. And we also have this interruption of Dr. Sawyer while he's treating a patient to go over some kind of minuscule details of her job, and Dr. Sawyer finally said she's not going to work out. She's not going to work out. Remember, he hired her, he promoted her to a permanent job, he's the one that terminated her. But in Bow Brothers Construction, there was daily sexual abuse, if I understand the opinion, that went on for over 40 months, and there's 60, 60 overt sexual acts that occurred. And the question there was hostile work environment, but again, you're looking at whether this kind of activity and complaints about it would be considered protected activity, and that was retaliation. You're approaching a topic I wanted to ask you about, which is your insistence in your brief on reliance on hostile work environment, when in fact, as we all know, we're dealing with retaliation, and whether there was protected conduct, and protected conduct generally is someone reporting something, and then an adverse employment action being taken against that person. So I don't, I'm having trouble fitting hostile work environment with, with protected conduct. Well, you have, the way I'm trying to explain it is that you look at the Bow Brothers case and it's instructional, because it tells you, there's no bright line as to what can go on in the workplace that will be illegal when you get to these kinds of comments and things like that.  So, we know in Bow Brothers, 60 acts like this and months of gender-based sexual abuse was enough to create a hostile work environment, and therefore a protected activity for the individual that complained about it. Dallas Morning News versus Myers, there were four, and that was not considered to be protected activity, and that was directly related to a race claim. I think there's disparate treatment going on among these other employees. So if an employee approaches a supervisor and says, I have been discriminated against, and of course there's a background on this, of other comments this man made, I have been discriminated against, and then she or he is fired the next day, that is not sufficient protected activity. It depends on the facts. It wasn't in, in Myers. Well, this person reported, I'm being discriminated against. That's what she, you know, subjectively thought, and that's what, arguably, that's why she was fired. That's her case. There's two standards that have to be applied. It's her subjective belief, which we don't dispute, and the jury also has to decide as a matter of law based upon Myers and the Compass Group case that there must be an objectively reasonable standard. So it's from her point of view, and then it's up to the courts as a matter of law to look and see. During this sort of comment from this man for a considerable period of time, and I guess finally she'd had enough, and she reported it. Your Honor, she worked for the, for Amarillo Heart Group for five months. So there's four, possibly five complaints or issues that she overheard or she was participating in the, in the discussion. That's one a month for the whole time that she was there. That's a lot. But where's the problem? If she'd worked there five years, 60 comments would have been okay? I mean, I don't understand that. Well, it goes to whether her complaint is, in the Myers case. The problem is that you're applying a very legalistic standard that Ms. Scott should have known that this wasn't, that the amount of racist comments she'd received were not going to be enough to be, sustain a 12B6 or get around a 12B6. She's not a lawyer. I mean, that isn't her area. The purpose of retaliation as a cause of action is to allow people to complain without free, being free of retaliation, even when maybe the problem hasn't yet risen. We don't want her to have to wait five years until she's been subjected to daily comments of a racist nature, because this was apparently this guy's M.O. It wasn't one stray remark. She shouldn't have to do that, because she should report it, and the company should address it, and that should be that. And that's the, retaliation doctrine is meant to protect that by allowing that. Now, if you, if something couldn't possibly have been conceived as a, as a proper claim, I think that's where you have this objectively reasonable standard. But I don't think it's meant to say, if you haven't been abused enough, you can't complain. Because if you do, we can fire you with impunity. As far as Dr. Soya knew, this was the first complaint. And he didn't ignore it. They have policies. He investigated. Okay, the jury heard all this. They, they could weigh all this, and whether Soya's motive in firing her was because she wrote on the blackboard, or because she complained about this guy making these comments. To me, that isn't, that isn't even really your argument. Your argument is, as a matter of law, what she complained about isn't good enough. It, it should not be under Myers, because the, the four complaints there were, were more involved with racial discrimination than here. This was a comment by a co-worker that all black people look alike, which was disavowed. He, well, Your Honors, the, the workplace is populated with humans. And they make mistakes. And they, they issue bad judgment, and they lie about it. Well, this is why you complain, and you fix it. You know, the fact is, if he thought it would, let's, let's take him at his word, Mr. Immel, that he thought it was a joke. She didn't think it was a joke. He now is told not to do it. And we move on. That is exactly what this is all supposed to be about. But then, when you fire her the next day, what have you said? You've said, well, if you dare to take on this guy, Immel, and say, I don't want to be listening to these kinds of racist remarks, I don't find them funny, you're going to get fired. I, to me, that doesn't strike me as a matter of law win for you. Then the court would have to be saying that whenever anyone says something of a subjective belief that's anywhere close to something that's offensive to that person, then they're automatically immune, immune from being terminated. I mean, the temporal issue is something that practitioners deal with all the time, as, as this court is all aware. Should we wait 12 months? Do we gain anything by gaining more time between a situation like this and a decision, a legitimate business decision, which has not been really contested, to fire somebody? Well, but it was contested. I mean, you had a jury trial. And the fact is, no, you're not, you're not required to keep this person in your employ forever, just because they complained about racist comments. But you cannot fire them in retaliation for. And the thing is that, you know, a lot of these cases don't get tried. We get them on a 12 v. 6 or a summary judgment. But here we had a trial. The jury heard all of this. You very well could have won on the facts. You didn't. Do you want to talk about any of your other issues that if you, if you properly lost with the jury, any of this front pay or whatever, because you're running out of time? I have two alternative arguments. One is punitive damages. Even in the Bowe brothers' case, as outrageous as that was, there was not clear and convincing evidence that the company was doing things that it knew was wrong and that punitive damages were reversed. There were punitive damages and $300,000 awarded by the jury. And it's odd because there was no compensatory damages. Well, would you discuss specifically on the front pay issue whether it was sufficiently called to the district court's attention that the court should consider the fact of the punitive damage award in deciding about whether to award front pay? Well, the front pay, as the court knows, is an equitable relief. And there was an advisory jury verdict of zero, which the court decided without explanation to ignore. And our position is . . . Well, I think, because I want this on the tape, if you'll look at the memorandum opinion and order dated 20 November, 2013, I think that's probably, arguably, enough comments by the district judge about upholding the various awards where she concludes by saying both the jury's award of punitive damages and the other amounts of damages as awarded by the court are fully warranted under the specific facts of this case. So, I think the district judge did speak to this. Maybe not as expressly as we would all like, but she did speak to it. Well, it was spoken to by her at that hearing after we had our arguments. But I find it a bit inconsistent with having an advisory jury and rejecting the zero verdict because, after all, there is evidence that Ms. Scott did make some decisions about where she wanted to live that reduced her ability to find employment. All right. Your initial time has expired, Mr. McCowan. You've saved time for rebuttal. Hooper? Good morning, Your Honors. May it please the Court, Counsel? There are five arguments. My name is Nellie Hooper. I'm the counsel for Appellee Candon Scott. There are five issues on appeal. There are two procedural issues that I want to bring to the Court's attention, one of which I think is dispositive of one of the issues, and that's with regard to issue number two, whether the lower court erred in failing to grant Amarillo-Hartford's motion for new trial with regard to the retaliation claim. There was no briefing whatsoever in the appellant's brief on that. I've got a case, Yohe v. Collins. That's 985. We're very familiar with Yohe. Okay. Well, issues that are not are deemed to be abandoned. That's our position. That's not briefed at all. The other issue is the standard on appeal for two of the issues, and that's with regard to the motion for judgment as a matter of law. I provided two cases this morning to the Court and to opposing counsel that the errors should be plain error and not de novo as alleged in their brief. They never move for judgment as a matter of law prior to the close of evidence on the issues that are before the Court in this appeal, and therefore those issues should be reviewed on a plain. Actually, there is authority for the proposition that we're without authority to review issues that aren't properly raised on a motion for a matter of judgment or a matter of law. You look at the McClendon case out of our Court, analyzing the Unithurn case out of the Supreme Court. In addition, on top of that, to make it a little bit even more, they presented the motion as a motion for judgment as a matter of law and in the alternative motion for new trial. So they have alternative issues on appeal as well, appealing the denial of the motion. Does your case rise or fall on the standard of review? No. Okay, so why don't you get to what I see as the heart of the case, which is, is somebody, and I'll say the heart of the case from your opponent's standpoint, is somebody who complains about a racist joke now immune from being fired? No, no, Your Honor. They're not immune from being fired, but they are offered protection if they complain about it, and that's exactly what happened in this case. Other than the temporal proximity, which it's just shocking to me that the day after she has this whole big meeting about this guy's conduct, she gets fired. Other than that, what other evidence supports the notion that she was fired for this reason, for the reason of the complaint? Well, the fact that they knew that she was complaining, the timing is obviously very, very strong, but they knew that she was complaining about this race discrimination. The fact that they tried to cover it up, that they fabricated reasons for terminating her. They changed the reasons consistently, and then none of the reasons that they gave at trial, the evidence was pretty clear that the reasons were false. And his other argument is, and this is the sort of matter-of-law argument, is her complaint about these racist remarks doesn't rise to the level of protected activity because they sort of don't state a claim for race discrimination. Again, however offensive, and I think it's very offensive, so I'm not condoning the conduct, but he's saying it doesn't rise to the level of actionable race discrimination claim and therefore couldn't be protected activity. How do you respond to that argument? Well, first of all, he's incorrect on the law. The standard, and what he is trying to apply, and he consistently is trying, well, Emerald Heart Group is consistently trying to apply a hostile work environment standard when it has nothing to do with this case. She never alleged a hostile work environment. The underlying case, the underlying discrimination was not hostile work environment. It was a disparate treatment, and that was never alleged. And so that has nothing to do with this case. What is relevant is, did they know that what she was complaining about was race discrimination? And they did. And that can be found in the record at 1379 through 81. In the line of questioning, I asked Dr. Sawyer, did you know that she was complaining about these racial comments, and did you know that she was alleging that she was being discriminated on the basis of her race? And his response, not verbatim, but was, that's what she stated to me. So he was aware that that's what she was complaining about. And then if you go to the testimony of Mr. Welty, who is in charge of implementing the policies and procedures, he testified that the race discrimination policies at Amarillo Heart Group were implemented and put in place to ensure that it followed the laws, the discrimination laws. And so I think with ‑‑ So then how can you sustain this finding of punitive damages if you had policies in place, even though they weren't followed? Using the Bowe brothers' example, they really weren't followed in that case. But nonetheless, we had a concern with the punitive damages. Well, with regard to punitive damages, I think what is relevant in what the evidence showed was the employer's state of mind, whether they knew or should have known that the conduct was unlawful. And I think the fact that they had a policy in place goes to show that they absolutely knew what the law was, or at least they should have known that the conduct was unlawful. But the whole idea that we want companies to have policies, and so the whole idea is if you have a policy and you follow it, then that mitigates perhaps altogether the case, but certainly the punitive damages. So you're kind of using the policy against them. Wasn't the problem that it wasn't followed? Yes. It's not enough just to have the policy. The policy has to actually mean something. They have to implement it. They have to follow it. And in this case, there was no evidence that there was any training on it. And in fact, on appeal, and I made this point in my brief, but they failed to actually provide as an exhibit on appeal the actual policy that they rely on for their good faith argument. And because of that, I think they will not be able to meet either the plain error or the great weight of the evidence on that for their good faith affirmative defense. There's no evidence that they provided any training to their employee on this policy, no evidence on the procedure for their grievances. In fact, when you look at the evidence on how they actually treated this particular complaint, the evidence is overwhelmingly in favor of the verdict. They did not investigate it. The testimony, I believe, from Mr. Welty was that without even an investigation, without talking to the complainant, without talking to the person accused of making the statements, he concluded that the comments were unintentional. No one ever documented it. No one ever asked for a statement from anyone. They never actually addressed her complaints at all. Now, they contend that they asked Mr. Emmel to apologize, but if you actually look in the record, he never did apologize for this statement. The statement that was made to her was, I am sorry, we are having a disagreement. And that's in the record, and that's found on 1351 to 1353 and 1374. And no one ever followed up with him to see if he ever apologized. So her complaint of discrimination was never actually addressed. So your basis on the two prongs for punitive damages is reckless indifference? Is that it, or is it malice, or is it both? It's either. It's malice or a reckless disregard to the federally protected rights of Ms. Scott. So under either standard. And what they look at is the conduct of the employer. And in particular, what they're objecting to is whether or not they knew that the conduct was unlawful in the mindset of the decision maker. They're saying we needed to show only Dr. Soya's mindset. But keep in mind, in this case, the decision maker for the person who, while Dr. Soya was the ultimate decision maker, there were three people involved in the decision to terminate. Dr. Soya ultimately made the decision, but Gerald Farnham, her immediate supervisor, was the person who actually sat down, talked to her, gave her two verbal reasons, gave a letter, put that in her personnel file with some additional reasons. And then Ron Welty was also involved and actually made the recommendation for termination. And he's the one that came up with the idea of the let's terminate her and let's say it's the probationary period that we're going to terminate her in. And throughout the course of this, Ron Welty was being consulted by Dr. Soya, not only with regard to the discriminatory statements, but also with regard to the termination. And so all— So they were all getting together to cook up a story to cover their tracks, and that is evidence of malice. I believe so, Your Honor. I believe that's what the jury was able to conclude. And I think that absolutely supports the award of punitive damages. Can you address the front pay, whether Judge Robinson gave sufficient reasons for awarding the front pay? Yes, Your Honor. And that's exactly what the court is to consider, is whether or not the court adequately explained why it awarded the front pay. And the court did consider this notion of punitive damages, which is what they're specifically appealing. And if you'll look at the hearing, the court actually held a hearing on the issue of front pay and equitable relief. And during the course of the hearing, these two cases that are now being brought to this court's attention, the Palo Soto case and the Smith v. Xerox case, were also presented to the district court. And in the middle of our hearing, she took a break so that she could get a copy of both of these cases to ensure she had the correct version of these cases, because there's a district court opinion and then a subsequent opinion. So she stopped the hearing to make sure that she had the correct opinions. We took a break, read the cases, came back, then she rendered her opinion. And then, as the court noted, she did speak to it, and there is evidence that she considered all of the factors that are necessary in considering an award of future pay, but in addition, future pay. Punitive damages as well. And I would like to address specifically the Palo Soto case and the Smith. Well, before I do that, I'd like to address that, well, let me just address the Palo Soto case. Let me ask you this before you get to those two points, because you've presented us with some authorities today. Obviously, they're not in your brief, about the failure to sufficiently raise issues in a motion for judgment as a matter of law in district court, and that arguably waives being able to pursue them on appeal. Yes. I simply do not recall this point being raised in your brief. Did you raise it in your brief? I did not, Your Honor. Well, then, it may well be that it's too late to be bringing that to us now, because we've had the briefing issue, and generally issues raised for the first time on appeal are not considered. And I think you have to complain about it timely for us to take that into consideration. And with the second case that I provided to you was the Von Steen case, and that's exactly what occurred in that case, where the appellee failed to present the standard of review in their brief and brought it up in oral argument. And what the court stated in that case said that neither party gets to choose the standard of review. It's incumbent upon the court, and that the standard of reviews have been raised for the first time in oral argument before, and the court has properly considered it. And that's the U.S. v. Von Steen case, which I provided in its sites to another Fifth Circuit case, Florida Peach Growers v. I recall Von Steen was a criminal. Yes. Yes, Your Honor. But in its sites to Florida Peach Growers Association v. United States Department of Labor. Your point is that the standard of review is a question of law that we have to decide, even if the lawyers don't brief it. Yeah, and that's what the cases say. You're bringing this up about they failed to present it properly in a judgment as a matter of law, arguably as some sort of affirmative matter that you had to present. I'm just flagging this for taking a close look at it. Yes, Your Honor. And it would be our position that it is incumbent upon the appellant to properly identify the standard of review upon which he presents his issue, they present their issue, and that would be our position. And it's incumbent on you to point out. You're absolutely right, Your Honor. You also benefit from the fact that we can affirm on any basis that appears in the record. You, as an appellee, don't even have to file a brief in order to win if there's something as a matter of law that we can use to affirm. That's correct. And so I presented those cases for you for your review. With regard to the retaliation issue, I did want to point out one other thing. In the record where it is undisputed that she was reporting a race discrimination complaint, and that is at 1379 and 1381. That's the second time you've given us that cite. Oh, I'm sorry. I didn't realize I had to give it to you. Yeah, because I wrote it down. Okay. I apologize. Could you distinguish the cases that he's saying these other cases involved complaints of discrimination and were found not to be a sufficient basis for a claim of retaliation? So how do you distinguish that authority, the Dallas Morning News case? All of the cases that he cites are not dealing with retaliation. All the cases that are cited are hostile work environment discrimination claims. And essentially, as I understand their argument, which, by the way, this is where they did not object to the jury instruction. They did not submit a different instruction or a different question. And the same is true for the punitive damages. This is not an excessive damages challenge, just a factual sufficiency. But back to the retaliation, what they're essentially asking is the court to apply a different legal standard than what went to the jury. And they didn't object to it. And that's really what that legal point is about. And it's simply just not the law. They cannot cite to any authority that would require a plaintiff to prove their underlying discrimination case in order to prevail on their retaliation. They just can't do it because it's just not the law. Would you, again, for our assistance when we listen to this, again, working on the opinion, state for us of the five issues he raises, which ones you claim he waived by not adequately presenting them in a judgment or motion for judgment as a matter of law in district court? Issue number one and issue number three. Great. Issue number one is evidence she possessed an objectively reasonable good faith belief that they'd engaged in an unlawful employment practice. Yes, that's what this is with regard to retaliation. And then issue number three. Okay, that's the one about punitive damages. Yes, on issue as a matter of law.  Okay, so it's issues one and three you think are waived because they weren't presented with the judgment as a matter of law in district court. Yes, and if the court were to consider them, it would be under a plain error. Well, no. Well, we don't need to get in that. Okay, and if the court doesn't have any more questions, then . . . All right, thank you, Ms. Hepburn. Mr. McCowan, you've saved time for rebuttal. Briefly, Your Honors. After the case was closed and rested, we had what is typical that we presented our motions and they presented their motions. And on page 408, which is in the transcript, at 1596 in the official record, Ms. Judge argued we have nothing more than plain and subjective belief that her complaint was a basis for her termination. The reasonable belief standard was charged by the court, so it is part of the charge. Now, in the judgment for a matter of law, we again raise this issue of the lack of the objectively reasonable belief. And that's found on the record on page 1036 in page three of the actual motion. It was never responded to by Ms. Scott in her response to our motion for JML. So, in effect, our position is that we did properly raise it. It was not waived, and she actually waived it for failing to respond and, quite frankly, didn't even respond in the briefing. How about issue number three about punitive damages? Was that presented in your judgment? Yes, it was. It was. Basically, we presented the motion for judgment as a matter of law, and it was just a more expanded version, and we tried to be more efficient with what we ended up teeing up the issues for this court to consider. Also, there is a little bit of confusion here and disconnect about hostile workplace environment and the fact that the judge would not submit the discrimination claim to the jury. But if you look at page 23 of Ms. Scott's reply brief, she says her claim, it seems to me that she's saying her claim is a disparate treatment claim, and that's not retaliation. And that is something that's very confusing. It seems like there's a disparate treatment claim, and then she says there's no hostile work environment. So it's racial discrimination in the form of disparate treatment rather than racial discrimination in the form of hostile work environment. I think that's what she's saying, but, I mean, I don't want to speak for her. It says what it says in the brief on page 23. She says it's not hostile work environment. It is this issue, but it still comes back to the point as to if temporal issues are not going to be controlling, is a one complained about comment that is not even really directed at her, it is about her race, all black people look alike, is that going to be sufficient to get protected activity under the law? And your best case that it's not is? Best case that it's not protected activity is the Compass Group case. And by analogy, the Bro Brothers case. I just don't think Bro Brothers has to do with this, but. It's just, it's got to be enough. I'm starting to get the feeling from Bro Brothers that it's got to be really bad, and, I mean, that's for the predicate act of discrimination, and Bro Brothers actually, it's really about a legal question of sort of what kind of discrimination can be actionable. But that said, I don't think that's what, she's not appealing the dismissal or whatever of her original race discrimination claims. One final comment, and I'll be through, Your Honors. Here's what I've tried to point out. Sixty obviously was too much in the Bro Brothers case. Four wasn't enough in the Dallas Morning News case. Is one enough in the Amarillo Heart Group case. And that's what employers will struggle with. For what? For it to be protected activity. I mean, if you just don't retaliate against people for making complaints of discrimination, you don't have a problem. It's not some confusing thing. But that makes temporal scope to be controlling. It's not controlling, but it's relevant. I mean, firing somebody the day after they make a complaint of race discrimination is a dangerous thing to do, I would agree. And here it doesn't look like they had much to back it up, and they kept changing their story, and they weren't credible, and the jury bored them out. But we're not actually attacking that. We're talking about the fact that there was one statement, and is that what we want to have the American workplace dealing with? And that's really for Congress to say. If somebody is going to complain, you've got to have a six-month cooling-off period. I mean, there's no bright line to give employers guidance here. Yes, there is. A jury trial. That's the test. Our version, your version, the jury decided it, and you've got a real high hurdle, as you know, on the judgment as a matter of law. I recognize that, and I've tried enough jury trials where I appreciate it. But there is a question of law that this court has to deal with, and that is, our question is, is this enough? Thank you, Your Honor. All right. Thank you, Mr. McCown. The case is under submission.